84

Rockingham,
Mar. 3, 1953. } No. 4158.

HAMPTON *v.* SEABROOK.

*John W. Perkins, Frank A. Batchelder* and *Everett P. Holland*
(*Mr. Holland* orally), for the plaintiff.

*William H. Sleeper* and *Wayne J. Mullavey* (*Mr. Mullavey*
orally), for the defendant.

GOODNOW, J. The principal issue of this case is whether the
boundary line between these two towns passes through a marked

rock called Bound Rock, as claimed by Hampton and as found by the master, or through the middle of Hampton River mouth as claimed by Seabrook. The defendant's exceptions first present questions as to the sufficiency of the evidence on which the master's findings are based.

Bound Rock, as it is known today, is located six hundred feet or more southerly of the south bank of the present river mouth as it opens into the Atlantic Ocean and about three hundred seventy-five feet westerly of the present ocean shore line. It is at the bottom of a cement well placed there by the State Highway Department in 1931 or later. The top surface of the rock is about six feet below the present ground level and bears near its highest visible surface the letters and figures "A D 1657." Below this notation are the letters "H B" and still further below appear the figures "1850." The area of water at the Hampton River's mouth as recently as 1910 was so extensive that this rock, now so buried and separated from the open water, was located about at the middle of the then river mouth. Soundings through the sand around the cement well where Bound Rock may now be seen indicate that it is a part of a ledge which runs north and west from the presently visible spot.

Certain historical facts are essential to an understanding of the case. Hampton and Salisbury were incorporated, both within the Province of Massachusetts, prior to 1640, Hampton being the northerly of the two towns and each of them bounding on the Atlantic Ocean. Disputes as to their boundary line arose immediately. In 1657 the line, since known as the Shapleigh line, was officially established as a straight line running westerly "beginning at the middle of Hampton River mouth and running upwards unto a marked tree" at the "Bacheldors" farm "marked outt According as Capt Shapligh hath drawn the plott." XXIV N. H. State Papers (Batchellor 1894) 874. In 1712, the new parish of Hampton Falls was established to include a part of Hampton (IX N. H. Town Papers 335) and the division line between it and Hampton was established in 1729. By this division, the easterly part of Hampton Falls became a triangular area with its apex at the river mouth, its northerly boundary along the new division line with Hampton and its southerly boundary the so-called Shapleigh line which had separated Hampton and Salisbury. In the meantime, the northerly line of the Province of Massachusetts had been moved southerly and upon the final determination of its location (substantially as it now exists) in 1741, the town of South Hampton

was established on May 25, 1742, to include that part of the original town of Salisbury lying northerly of the new Massachusetts line and southerly of the Shapleigh line. XXV N. H. State Papers (Batchellor 1895) 521. Later that year, on December 4, 1742, certain "inhabitants and their estates" in the new South Hampton were annexed to Hampton Falls (2 N. H. Laws 717) but this division of South Hampton "did not extend to . . . the ocean, and did not include the beach lands." *Seabrook v. Fowler*, 67 N. H. 428, 431. In 1768, still another new town known as Seabrook was established to include a part of Hampton Falls. 3 N. H. Laws 505. This division, besides including that part of South Hampton set off to Hampton Falls in 1742, roughly split the easterly end of the triangular area set off to Hampton Falls from Hampton, placing the southerly part in Seabrook and leaving the northerly part in Hampton Falls. The northerly boundary of Seabrook's triangular area was along the new division line with Hampton Falls and the easterly end of its southerly boundary was the Shapleigh line. This made South Hampton the bordering town of Seabrook on its south at the time of the latter's establishment in 1768, separating Seabrook "from the ocean." *Seabrook v. Fowler, supra*, 432. In 1822, the easterly part of South Hampton became a part of Seabrook. 9 N. H. Laws 85. In none of these instances was any mention made of any rock as a part of the southerly boundary line of Hampton.

The master in effect found that the Shapleigh line established in 1657 fixed the starting point as the middle of Hampton River mouth, that in 1795, Seabrook recognized the existence of Bound Rock as a point in the Shapleigh line by its agreement with South Hampton, that the 1806 maps of Seabrook and Hampton indicate that the true line between the towns passed through Bound Rock and that the Bound Rock then referred to is the rock now known as Bound Rock. The defendant questions the sufficiency of the evidence to support these findings.

Among the many old records in evidence, the first to contain any mention of Bound Rock is dated 1795. In that year, South Hampton bordered on the ocean and Seabrook was limited in its most easterly part to a roughly triangular area with its apex at the ocean. Its northerly boundary was on the course established by its 1768 division from Hampton Falls and the most easterly end of its southerly boundary was along the old Hampton-Salisbury or Shapleigh line on South Hampton. The records of South Hampton contain an agreement made by "the selectmen and committees"

of South Hampton and Seabrook concerning a division line "for taxation of lands belonging to non-residents" which extends south of the old Hampton-Salisbury line and then runs northerly "until it strikes Shapley line (so called) then running eastwardly as said Shapley's line runs to the bound rock (so called) at Hampton River's mouth." The defendant takes the view that this document is of no evidentiary value since it had nothing to do with Hampton and dealt only with a division line for tax purposes. Its importance rests in the fact that it contains a recognition by Seabrook, whose south line at its easterly end was then the Shapleigh line, that Bound Rock was a part of that line.

In 1806, maps of both Seabrook and Hampton were prepared by the same surveyor and filed with the Secretary of State, presumably pursuant to the act of the Legislature. (7 N. H. Laws 249) requiring that an accurate survey of each town be made and a map thereof be so filed. The maps are not drawn with the clarity and precision of some modern maps and carry on them various notations by the surveyor. Their meaning in many respects is disputed by the parties. The Seabrook map shows "B rock" at the ocean. While the Hampton map does not show Bound Rock on the map itself, the surveyor's notes refer to it and indicate that it was in the south line of Hampton and then located on the south bank of Hampton River. There are other notations as to the length of Hampton's bound on the ocean concerning which the parties disagreed in interpretation but which were found by the master to confirm the location of Bound Rock as a corner in the Hampton line. From the maps filed with the Secretary of State, Carrigan's map of New Hampshire dated 1816 was prepared and adopted as the official map of the state. This map was also in evidence. As to the Carrigan map, the master found that it did not "afford much aid." After consideration of the 1806 maps, the master concluded that "some rock known as Bound Rock was regarded as early as 1806 by this surveyor as a fixed and permanent point in the line separating the two towns." Both maps were evidence of the true line between the towns. They both "had some tendency . . . to show that a line corresponding with said plan was run and marked also upon the ground at that time if not before." *Wells* v. *Iron Company*, 48 N. H. 491, 538. The weight to be given to the maps rested with the trier of facts. An examination of Carrigan's map with the 1806 maps does not support the defendant's contention that the master was clearly wrong in finding

the Carrigan map of little aid. The finding from the 1806 maps that the true line includes Bound Rock is not compelled by an examination of the maps but such a finding is not without foundation and that determination rested with the master.

The master identified the rock known today as Bound Rock as the same rock referred to in 1795 and 1806. In support of this, he found it to be the only rock in the vicinity today bearing distinctive markings and notes that the date of 1657 appearing on it is the date of the establishment of the Shapleigh line. He observed the rock on the view and found the markings to be "surely ancient." The defendant's suggestion that the lack of evidence in explanation of the markings makes the finding untenable is without merit. This evidence taken with that of witnesses having personal knowledge of the existence of the markings for many years and the statement in an old publication of 1856 concerning Seabrook noting that "the old line from the 'Bound Rock,' at the mouth of the river, on which is yet observable the inscription 'A. D. 1657 H. B.' " is sufficient to support the determination of the identity of Bound Rock.

This evidence, taken together, supports the finding by the master that the true line between these towns runs through Bound Rock as it is known today. "The findings were reasonable inferences though contrary ones may also have been." *Vallee v. Company*, 89 N. H. 285, 288.

Among the old records included in the evidence is a page from the town records of Hampton containing under date of September 21, 1664, a purported report by a committee which had been named by the Quarterly Court in 1663 "to end the differences between" Hampton and Salisbury concerning their line "from Hampton River's mouth to Mr. Batchellers markt tree." The order appointing the committee had directed them to make return of their decision at the next County Court at Hampton. The court records where this order is found do not contain any report by this committee or any official action establishing the line. The report states that the committee determine that the line shall run "from the southmost point of the rock commonly called by the name of the great rock directly to Mr. Batchilder's marked tree . . . The southmost part of the rock is to be taken at low water." To the admission of this record, the defendant excepted both on the grounds that it could not be used to show the legal establishment of the line and because it had no other probative value. An examination

of the master's report indicates that the document was not treated as a legal determination of the line but was simply noted as the first mention in any record of a rock in the boundary line. While there is no explanation for the existence of this document in the records of the town of Hampton, that not appearing to have been the proper depository for the committee's report, it is obviously of great age. Its use in evidence as showing the existence in 1664 of a rock suitable for a bound which was located in the river mouth, as indicated by the provision that the southmost part was to be taken at low water, was proper. The master appears to have made no more extended use of the document in his findings and the defendant takes nothing by its exception. Other exceptions taken by the defendant during the trial to the admission of evidence have been examined and found without merit.

The defendant further claims that Hampton, by its failure to tax or exercise other municipal control over land south of the river mouth, has treated the middle of Hampton River mouth as the correct line between the towns for such a period of time that it should now, as a matter of law, be so regarded. *Bath* v. *Haverhill*, 73 N. H. 511, 514. It also urges the determination of the line in the middle of the river mouth as a practical location on the grounds that such a location has been long established and acquiesced in. *Heywood* v. *Lumber Company*, 70 N. H. 24, 29. Requests for determination of the line on either one or both of these bases were made at the trial and denied. The evidence is clear that until the establishment of adequate seawalls and breakwaters within the past few years, the mouth of Hampton River has varied in location, both north and south, and in width, from its present one thousand feet to over four thousand feet. In many of the years prior to 1948 when the defendant claims that the failure of Hampton to assert municipal control indicates an acquiescence on its part, the area north of Bound Rock which is now land was entirely covered with water. The findings of fact urged by the defendant in support of these claims rested with the master as the trier of facts. *Bath* v. *Haverhill, supra,* 514. The evidence in their favor not being conclusive, the defendant's exceptions to the denial of its requests for such findings are not sustainable.

The location of the westerly terminus of the boundary line between these towns was based by the master upon the division line established between Hampton Falls and Seabrook in 1768. At that time, the northerly line of Hampton Falls, as established in 1729,

followed the center of Hampton River to the mouth of Hampton Falls River. By the 1768 establishment of Seabrook, it was provided that the new division line between Hampton Falls and Seabrook should go generally easterly along Brown's River (a river south of Hampton River) to the western end of an island, then around on the southern and eastern sides of the island "to the aforesaid river and to the mouth thereof." 3 N. H. Laws 505. The master found that the mouth of Brown's River is at Hampton River, some distance westerly from where the mouth of Hampton River joins the ocean. He determined the westerly terminus of the line now in dispute as the confluence of those two rivers. The mouth of Brown's River is not so distinctly apparent as to compel this finding but the conclusion reached by the master as to its location is amply supported by the evidence and his manner of locating it is a reasonable inference from the acts establishing the division lines.

The findings concerning the course and extent of the line through Bound Rock to the ocean are amply supported by reasonable inferences from the evidence before the master and the defendant takes nothing by its exceptions to them.

*Exceptions. overruled.*

All concurred.